# No.14-1365

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**PAUL D. CEGLIA, an individual,**

*Plaintiff-Appellant,*

**-v-**

**MARK ELLIOT ZUCKERBERG, an individual, and FACEBOOK, INC., formerly known as THEFACEBOOK, INC., a Delaware Corporation,**

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of New York, (District Court No. 10-cv-00569)

## REPLY BRIEF OF APPELLANT

JOSEPH M. ALIOTO
    *COUNSEL OF RECORD*
ALIOTO LAW FIRM
ONE SANSOME STREET, 35TH FLOOR
SAN FRANCISCO, CA 94104
(415) 434-8900

GIL D. MESSINA
MESSINA LAW FIRM, P.C.
961 HOLMDEL ROAD
HOLMDEL, NJ 07733
(732) 332-9300

*Counsel for Plaintiff- Appellant*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv**

**I. ARGUMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

    **A. Defendants Failed to Justify the Procedural Irregularities Underlying the R&R Which Required Defendants' Motion to Dismiss to Be Treated As One for Summary Judgment.** . . . . . . . . . . . . . **1**

        **i. Rules of Evidence 901 and 1008 Clearly Applied to the Motion to Dismiss.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    **B. Plaintiff Offered Competent and Admissible Evidence to Rebut the Defendants' Charges of Fraud and Spoliation.** . . . . . . . . . . . **8**

        **i. When Defendants' Experts Examined Ceglia's computer, They Did Not Make a "Case-ending Discovery".** . . . . . . . . . . . . . . **8**

        **ii. Defendants' Page 1 Forgery Theory Proves the Authenticity of the Work for Hire Contract.** . . . . . . . . . . . . . . . . **13**

        **iii. Defendants' Argument that Chemical Analysis of the Handwritten Ink on the Work for Hire Contract Revealed that the Ink Was *Less Than Two Years Old* is Not Supported By the Evidence, Much Less By Clear And Convincing Evidence.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

        **iv. Defendants' Claim That "One of the Nation's Leading Document Authentication Experts Examined the Typesetting and Formatting of The Work for Hire Document" and Concluded it was an "Amateurish Forgery" is Misleading and Unsupported.** . . . . . . . . . . . . . . . . . . . **17**

**C. Defendants Ignore Zuckerberg's Access to His Harvard E-mail Account in *October 2010* and the Total Absence of E-mails Between Him and Plaintiff From April 2003 (When the Work for Hire Contract Was Signed), and June 2003.** . . . . . . . . . . . . . . . . . . . . . . . 18

**D. The Magistrate's Conclusion That Plaintiff Committed Acts of Sanctionable Spoliation of Evidence is Baseless.** . . . . . . . . . . . . . . . . . . 19

    **i. The Conclusion That Plaintiff Failed to Produce Copies of All Versions of the Work for Hire Contract is Baseless Because Other Versions Do Not Exist.** . . . . . . . . . . . . . . . . . . . . . . 20

    **ii. Ceglia Did Not Produce E-mails That Were Backdated or Which Had Time-stamp Anomalies or Other Indicators of Fraud.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    **iii. Irrefutable Video and Documentary Evidence Show That Defendants' Experts, Not Ceglia, "Baked" The Work for Hire Contract.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    **iv. Ceglia Did Not Destroy Six USB Devices And Any Relevant Evidence That May Have Been On The Devices Was Produced to Defendants.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    **v. Reinstallation of the Windows Program Was Not Spoliation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**E. The "Kasowitz Letter" is Sound and Fury Signifying Nothing.** . . . . 25

**F. The Facts Show That Plaintiff Never Claimed the "Kole E-mails" Were Privileged.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**G. It Was Not Impossible, But Likely, That Plaintiff Visited TheFacebook Site Before it Went "Live".** . . . . . . . . . . . . . . . . . . . . . . . . 27

**H. Defendants' and the Magistrate's Comments About McMenamin's So-called "Linguistic Analysis" Are Not Based on Clear and Convincing Evidence and Exemplify the Errors Committed Below.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**I. Last Accessed Dates, Incorrect Time Zone Stamps and Inconsistent Formatting Do Not Indicate Ceglia's E-mails are Fraudulent.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**II. CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

**APPENDIX 1**

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Page</u>

*Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Chin v. Port Auth. of New York & New Jersey,* 685 F.3d 472
    (2nd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 32

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). . . . . . . . . 17

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998). . . . . . . . . . . . 2

*Gen. Tire & Rubber Co. v. Jefferson Chem Co.,* 46 Frd 607 (S.D.N.Y. 1969). . . . 3

*In re Dynex Capital, Inc. Securities Litigation,* 2011 U.S. Dist. LEXIS
    67756 (S.D.N.Y. June 20, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Dynex Capital, Inc.* 05-cv-1897 (HB)(DF) (S.D.N.Y. April 29, 2001). . . . . . 7

*In re Pfizer,* 2013 U.S. Dist. LEXIS 2850 (S.D.N.Y. January 8, 2013). . . . . . . . . 32

*Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939). . . . . . . . . . . . . 27, 28

*Kopec v. Coughlin*, 922 F. 2d 152 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . 17

*Montano v. City of Chicago,* 535 F.3d 558 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . 7

*Montez v. Department of Navy*, 392 F.3d 147 (5th Cir. 2004). . . . . . . . . . . . . . . . 2

*Morrison v. Amway Corp.*, 323 F. 3d 920 (11th Cir. 2003). . . . . . . . . . . . . . . . . . 2

*Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123
    (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Phillips v. Bowen,* 278 F.3d 103 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pope v. Fed. Express Corp.*, 974 F.2d 982 (8th Cir. 1992). . . . . . . . . . . . . . . . . 4

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). . . . . . . . . . . . . . . . . . . 7

*REP MCR Realty, LLC v. Lynch*, 363 F. Supp. 2d 984 (N.D. Ill. 2005). . . . . . . . . 4

*R.F.M.A.S., Inc. v. So,* 271 F.R.D. 13 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . 32

*Schiel v. Stop 'n' Shop Co.,* 2006 U.S. Dist. LEXIS 73508
    (D. Conn. Sept. 7, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998). . . . . . . . . . . . 7

*Szanto v. Omnicom Grp. Inc.*, 597 F.3d 501 (2nd Cir. 2010). . . . . . . . . . . . . . . . 3

*Tradecomet.com LLC v. Google, Inc.,* 647 F.3d 472 (2nd Cir. 2011). . . . . . . . . . 8

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities*
    *Master Fund, Ltd.*, 661 F.3d 164 (2nd Cir. 2011). . . . . . . . . . . . . . . . . . . . . 3

*Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377
    (S.D. N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Constitution

Seventh Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

## Statutes

28 U.S.C. § 1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Rules of Civil Procedure

Rule 12(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Rule 12(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Rule 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5

Rule 56(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Rule 56(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Rule 60(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Rule 72(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Federal Rules of Evidence

Rule 201(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rule 901. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Rule 1008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Rule 1101(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Miscellaneous Authority

New York Times, July 24, 2011, "Decoding Your E-Mail Personality"
       Ronald Butters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# I.  REPLY ARGUMENT

## A.  Defendants Failed to Justify the Procedural Irregularities Underlying the R&R Which Required Defendants' Motion to Dismiss to Be Treated As One for Summary Judgment

Proceedings before the magistrate involved deciding the central issue of fact, on the merits – the authenticity of the Work for Hire Contract – an essential element of plaintiff's claims.  Conflicting evidence outside the pleadings required him to treat the motion as one for summary judgment under Fed.R.Civ.P. 56.  He did not.

Moreover, he took a leap into procedural limbo by deciding the motion as one for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), although that ground was "not addressed by the parties."  (SA-28-29).  His reasoning is circular and unsupported by law:

> ...Plaintiff seeks a jury determination that the Work for Hire Document grants him an ownership interest in Facebook, such request presumes the Work for Hire Document is authentic.  Defendants, by challenging the Work for Hire Document's authenticity, have injected into the case a factual issue which, if decided in Defendants' favor, would establish there is no actionable case or controversy, such that the court is without jurisdiction over the matter. ... [A] determination that such document is a fabrication would establish there is no case or controversy but, rather, only a 'feigned case' is presented over which the court has no jurisdiction.

(SA-29).

1

The magistrate used his treatment of the motion under Fed.R.Civ.P. 12(b)(1) to bootstrap his consideration of matters outside the pleadings, in an *ad hoc* proceeding of his own devising, disregarding the requirements of summary judgments under Fed.R.Civ.P. 56. (SA-29-32).[1]/ Here, the magistrate ignored black letter law holding if jurisdiction requires fact-finding on an issue central to the merits, "the Court must leave the jurisdictional issue for the trial." *Alliance for Environmental Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006); *Morrison v. Amway Corp.*, 323 F. 3d 920, 925 (11th Cir. 2003) ("the district court should only rely on Fed.R.Civ.P. 12(b)(1) '[i]f the facts necessary to sustain jurisdiction *do not implicate the merits of plaintiff's cause of action*.'" (emphasis in original)); *Montez v. Department of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) ("where issues of fact are central both to subject matter jurisdiction and the claim on the merits, ... the trial court must assume jurisdiction and proceed to the merits."); *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 (S.D.

---

[1] The magistrate relied on *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) – a case not mentioned by defendants – for procedural justification. That decision is inapposite. It reversed the dismissal of an antitrust case on comity and jurisdictional grounds under the Foreign Sovereign Immunities Act and Foreign Trade Antitrust Improvements Act. That was far different from the situation here, which involves plaintiff proving the authenticity of the underlying contract, an essential element of his cause of action, over which the district court had jurisdiction under 28 U.S.C. § 1332.

2

N.Y. 2009) ("where the overlap between jurisdictional and merits evidence 'is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial.'").

As argued in appellant's opening brief (pp.39-44) – and ignored by defendants in their's – courts may not bypass the requirements of Fed.R.Civ.P. 12(d) in the interest of expediency. *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991). A motion to dismiss that relies on evidence, "despite the labels used by counsel, must be treated as one for summary judgment under Fed.R.Civ.P. 12(b) and 56." *Gen. Tire & Rubber Co. v. Jefferson Chem. Co.*, 46 F.R.D. 607, 609 (S.D.N.Y. 1969).

Here, the magistrate erred by expressly ***not*** following the requirement to "'construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [his] favor.'" *Szanto v. Omnicom Grp. Inc.*, 597 F.3d 501, 504 (2nd Cir. 2010); *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2nd Cir. 2011). He did the opposite.

Defendants justify the magistrate's "discuss[ion of] only the evidence most favorable to Defendants ... and any relevant rebuttal evidence submitted by

3

Plaintiff" (SA-36) by arguing that if he had done otherwise, it "would have made a 155-page opinion even longer." (Defs. Br.57). Had the magistrate construed the evidence appropriately and correctly, the R&R would have been shorter because plaintiff and his experts all testified to the authenticity of the Work for Hire Contract, thereby creating a disputed issue of fact for trial.

Defendants argue that dismissal under inherent authority is an appropriate sanction for proffering a forged document. (Defs. Br.50-52). Defendants (mis-)cite *Pope v. Fed. Express Corp.*, 974 F.2d 982 (8th Cir. 1992) as their authority, neglecting to advise that the Eighth Circuit observed: "Appellants concede...[the forgery] was a manufactured document. Therefore there is no jury issue." *Id.* at 984.

In *REP MCR Realty, LLC v. Lynch*, 363 F. Supp. 2d 984, 1015 (N.D. Ill. 2005), cited by defendants, the court observed, "Lynch does not argue that a grant of the sanctions motion would conflict with the Seventh Amendment. The Court therefore considers the issue waived." What follows is, therefore, *dictum*.

### i.  Rules of Evidence 901 and 1008 Clearly Applied to the Motion to Dismiss

Defendants argue, without authority, that Fed.R.Evid. 901 and 1008  had no application below because they relate only to admissibility "at trial." (Defs. Br.53)

First, defendants' premise, that the magistrate was not required to treat their motion as one for summary judgment, has been shown to be wrong.

Second, under Rule 56, the magistrate should have denied the motion. That the magistrate "*consider[ed]*" plaintiff's evidence (Defs. Br.53), is short of the requirement that the court view the evidence in the light *most favorable* to the non-moving party and afford him all favorable inferences. Fed.R.Civ.P. 56 requires that all evidence be competent and admissible. See also, Fed.R.Civ.P. 56(c)(2) and 56(c)(4). The Rules of Evidence apply to trials *and* to summary judgment proceedings.

Fed.R.Evid. 901 provides that "[t]estimony of a [w]itness with [k]nowledge …that an item is what it is claimed to be" is "sufficient to support a finding that the item is what the proponent claims it is." Ceglia's testimony is all that was required. Given that the evidence must be viewed in the light most favorable to plaintiff, only a jury could find otherwise under Fed.R.Evid. 1008.

In *In re Dynex Capital, Inc. Securities Litigation,* 2011 U.S. Dist. LEXIS 67756 (S.D.N.Y. June 20, 2011), Judge Baer accepted Magistrate Freeman's Report and Recommendation denying defendants' motion to dismiss for fraud on the court. Unlike the perfunctory acceptance by the district judge in this case (SA-158), Judge Baer's decision discusses the objections made to the Report and

5

Recommendation and the support for the magistrate's decision, clearly evincing a *de novo* review under Fed.R.Civ.P. 72(b)(3) ("district judge must determine de novo any part of the magistrate judge's disposition...properly objected to").

Here, plaintiff's declaration as to authenticity was corroborated by his experts' declarations which controverted defendants' experts, and his successful polygraph test (JA-240).[2]/

On the other hand, defendants' motion was supported by Zuckerberg's ambiguous declaration that he "***did not sign the document attached as Exhibit A to the Amended Complaint***" (emphasis added)  (JA-114  ¶ 5), and his experts' controverted reports that the Work for Hire Contract and supporting e-mails are not authentic.  Such evidence cannot rise to the level of clear and convincing under *Schiel v. Stop & Shop Co.,* 2006 U.S. Dist. LEXIS 73508, *21 (D. Conn. Sept. 7, 2006), which defendants try to distinguish.  Plaintiff cited *Schiel* in support of the argument that competing expert reports are not sufficient to meet the clear and convincing standard.  Although *Schiel* involved a Fed.R.Civ.P. 60(b)(3) motion, the same clear and convincing standard applies there as to

---

[2]  The experts' reports for both sides are voluminous (JA-628-970, 1063-1079, 1096-1539, 1583-2347).

defendants' motion. Defendants' evidence fell short because their experts' testimony was effectively rebutted by plaintiff's experts.

Magistrate Freeman concluded in her Report and Recommendation in *Dynex* as follows:

> Yet the task of determining the truth or falsity of the substance of the allegations contained in the [complaint] and attributed to the [witnesses] falls within the province of the jury. *Phillips v. Bowen*, 278 F.3d 103, 110 (2d Cir. 2002) (noting that leaving judgments of fact to the jury is "the foundation of our legal system.") Similarly, the jury – not the Court – should determine whether fact witnesses are credible. *See Montano v. City of Chicago*, 535 F.3d 558, 567 (7th Cir. 2008) (reversing imposition of case-dispositive sanctions because it was for the jury to determine credibility of witnesses). It is difficult to imagine how the Court could make the findings necessary to resolve Defendants' sanctions motion without impinging on the function of the jury.

*In re Dynex Capital, Inc. Securities Litigation,* 05-cv-1897(HB)(DF) (S.D.N.Y. April 29, 2011) Report and Recommendation at 11 (Doc. 107) (unreported).

Defendants cannot defend procedural irregularities in the R&R. The Supreme Court has admonished courts not to engage in "drive-by jurisdictional rulings." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 91 (1998); *Arbaugh v. Y & H Corp.*, 546 US 500, 514 (2006); *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010). That admonition was violated here, and this Court must correct it.

For the reasons stated, review in this Court is *de novo*, with all facts viewed in the light most favorable to the plaintiff. *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Tradecomet.Com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011).

## B.  Plaintiff Offered Competent and Admissible Evidence to Rebut the Defendants' Charges of Fraud and Spoliation

Each accusation, "fact," and aspersion in defendants' brief and the R&R was refuted by plaintiff.  Plaintiff will address the "facts" in defendants' brief which purport to support the findings in the R&R.[3]/

### i.  When Defendants' Experts Examined Ceglia's computer, They Did Not Make a "Case-ending Discovery"

Defendants' did not make a "case-ending discovery" when they found the Street Fax images on plaintiff's parents' computer.  This is defendants' principal

---

[3]  Defendants' accusations against plaintiffs' experts James Blanco (Defs. Br.51, 61) and Larry Stewart (Defs. Br.46) are scurrilous.  Blanco is highly regarded in his field, is the sole Forensic Document Examiner for the California Secretary of State in voter fraud cases and is tested twice a year in his field with a "Zero Personal Examiner Error Rate."  His wrongful expulsion from, and subsequent reinstatement in, a voluntary professional association, and LaPorte's misrepresentation of those events, are described in Blanco's declaration at JA-1598-1600, ¶¶ 33-36, n.11-17.  Stewart was the Laboratory Director/Chief Forensic Scientist for the United States Secret Service.  In a sleazy attempt to impugn him, defendants mention he was "indicted for perjury" for testimony in the Martha Stewart trial and then casually note – parenthetically – that he was acquitted.  See their CVs at JA-1683-1685 and JA-1186-1206.  This has been the defendants' style throughout this litigation.

canard. (Defs. Br.3).

It begins with the misrepresentation that defendants' experts examined "Ceglia's computer." What they examined was not plaintiff's computer, or even a computer he used or had access to: ***it was his parents' computer***.[4] Second, what defendants' experts found were two illegible TIFF images of the so-called "Street Fax document" that defendants now contend is the authentic contract between plaintiff and Zuckerberg. Plaintiff did not create the images or put them on his parents' computer. (JA-549-551 ¶¶ 8-20; JA-2403-2404, ¶¶ 11, 15). An original of the Street Fax document has never been produced and analyzed by experts, yet it is the keystone of the defense of this action.

The answer to how the TIFF images appeared on plaintiff's parents' computer lies with Zuckerberg (whose deposition was blocked) as well as a forensic analysis of his computers.[5]

What is known is that when Zuckerberg launched Facebook, he lied to

---

[4] See Declaration of Neil Broom, Certified Computer Examiner and Certified Fraud Examiner: "This item of evidence was not owned by the Plaintiff, was not used by the Plaintiff, and was not controlled by the Plaintiff[.]" (JA-1472). See also, Declaration of Carmine Ceglia, plaintiff's father: "My son, Paul Ceglia, never used the computer." (JA-1530-1531).

[5] Carmine Ceglia had a Street Fax internet account to which Zuckerberg had full access. (JA-1484).

9

plaintiff, claiming he was abandoning the project.  He knew he had a contract

providing plaintiff half of Facebook.  (JA-550 ¶ 10; JA-2402-2403 ¶¶ 2-6).  What

happened next is necessarily a matter of inference, largely because the magistrate

curtailed plaintiff's discovery.  A reasonable inference is that Zuckerberg created

the Street Fax images because the Work for Hire Contract had dire implications

for him, and  planted them on plaintiff's parents' computer.  (Broom Declaration

JA-1482-1491; Ceglia Declaration JA-2405-2406 ¶¶ 22-29).

Zuckerberg was both a skilled and experienced hacker, as he demonstrated

by hacking into Harvard's  computer.  He regarded it as mere "child's play."  (JA-

1482-1483).  On February 28, 2004, only five days before the Street Fax images

arrived on plaintiff's parents' computer,  Zuckerberg hacked into and disabled the

Street Fax computer at plaintiff's business out of pique at not receiving timely

payment.  (Argentieri Declaration, Exhibit A (JA-2342-2343)).  Zuckerberg's

language in his threatening e-mail reveals his true character:

> At this point I must follow through and remove the scroll search
> capability from the site.  I will do this after midnight tonight. [He in
> fact did so.]
> ...
> From this point forward, if for any month you fail to meet your monthly
> payment of $2000, I will shut down the entire site.  I will extend the
> deadline for this month's payment until March 14.

*Id.*

10

These are chilling words, made at the actual time of the events in question.[6]/

After planting the Street Fax images on plaintiff's parents' computer, Zuckerberg forwarded the contract from that computer to Sidley Austin's server, addressed to James Kole, who Zuckerberg knew was plaintiff's lawyer. Ceglia Declaration (JA-2405-2406 ¶¶ 23-28 (and references therein to record)).

Another highly suspicious feature of the Street Fax images is their small size and illegibility. (See JA-1491). Broom determined that the document was deliberately scanned as a small, illegible TIFF image and it defied logic for someone to take the trouble to reduce the size of a document to illegibility, scan it, and e-mail it to one's lawyer for the purpose of seeking legal advice. (JA-1488-1489).

In response, the magistrate misstated Broom's deposition testimony. He

---

[6] Defendants' assertion that payments plaintiff made to Zuckerberg track payments described in the Street Fax document rather than those in the Work for Hire Contract are explained by payments he received for additional work performed under the Work for Hire Contract. One would expect that when he fabricated the Street Fax document Zuckerberg would incorporate into the contract he would present as the authentic one payment terms which corresponded to the payments he received. Similarly, plaintiff's associate's sending of an e-mail to Zuckerberg that included language found in the Street Fax contract which was slightly different than that in the Work for Hire Contract, is explained by the fact that the Work for Hire Contract was created by cutting and pasting terms from what had been a template contract used by Street Fax from which the Work for Hire Contract was derived. (See JA-670).

11

said Broom "acknowledged that Plaintiff's practice of storing information on standard floppy disks would have required Plaintiff to reduce the size of the StreetFax Document prior to storage." (SA-47). He did not. First, the Street Fax images were not found on a floppy disk, but on a hard drive which was able to store a full-sized image. Second, Broom's testimony was diametrically *opposed* to the magistrate's finding:

> Q.      ... .
>         And at full size the TIFF files would have been, you know, well over 2-1/2 megabytes?
>
> A.      Yes.
>
> Q.      In other words, they would not have fit on a 3-1/2-inch floppy; correct?
>
> A.      Correct. But we're not talking about saving files on a 3-1/2-inch floppy disk, we're talking about sending it via e-mail.

(Doc. 495  T.153:17-154:25).

The plausible inference is that Zuckerberg was behind the Street Fax images and planted them on plaintiff's parents' computer and Sidley Austin's server.

Plaintiff's experts found other deficiencies. The computer numbering from assigned the two TIFF images indicates they were not placed on the computer from an attached scanner, but were planted in the computer from another computer

12

– indicating the work of a hacker.  McGowan Deposition (Doc. 496

T.39:21-45:25); Rose Deposition (Doc. 498 T.91:19-96:19).  Plaintiff's parents'

computer lacked antivirus protection and was found to be infected with multiple

viruses, including a "Root Kit," which allowed the computer to be invaded and

controlled by a hacker.  (JA-1474-1481).

The Street Fax images were found in ***an e-mail account belonging to***

***plaintiff's mother, which contained only three other items***, a highly suspicious

circumstance indicating intrusion by a hacker.  (JA-1486-1487).

Finally, there is defendants' dramatic shift in their defense, which suggests

that if there was any forgery in this case, it was Zuckerberg's creation of the Street

Fax document.

### ii.  Defendants' Page 1 Forgery Theory Proves the Authenticity of the Work for Hire Contract

Defendants originally conceded that the second page of the Work for Hire

Contract with Zuckerberg's signature was authentic, but that page 1 of the Work

for Hire Contract was a recent fabrication that Ceglia substituted for page 1 of the

Street Fax document.

Defendants' contention, and the magistrate's conclusion, that the "'page 1

substitution theory' was concocted by Ceglia" (Defs. Br. 61) is belied by

13

defendants' own arguments in the district court and their experts' opinions. See Pls. Br. pp.27 (last bullet point) -28. This is critical because if, as defendants and their experts consistently asserted, the Work for Hire Contract is a page 1 forgery with an authentic second page, then, as will be seen, it is inescapable that the *entire* Work for Hire Contract is authentic.

Defendants now take the new position that *both* pages of the Work for Hire Contract are fabrications. However, they refer to Ceglia's indictment, which is self-defeating. Defs. Br.42. The government is proceeding against Ceglia under the same theory defendants now disavow, namely that the Work for Hire Contract is a page 1 forgery with an authentic second page and ***the information was obtained by the government from Zuckerberg himself.***

In the criminal complaint, ***after interviewing Zuckerberg***, the Postal Inspector swore:

> To support his lawsuit, ***CEGLIA replaced page one of the actual contract with a new page one*** doctored to make it appear as though Zuckerberg agreed to provide CEGLIA with an interest in Facebook[.]

(Doc. 581, ¶¶ 5, 11 (emphasis added)).

Defendants' page 1 substitution theory wasn't "concocted" by plaintiff. It was defendants' theory, it is the basis for the government's ill-advised

14

prosecution, and it came from Zuckerberg.  In this case, ***defendants' counsel assured the magistrate that Zuckerberg would authenticate the Street Fax document as the real contract and it "would be easy to do"*** (see Plf. Br.20 and JA-1030 Hearing Transcript (April 4, 2012) T.165:1-8).  ***Zuckerberg has never done so.***

Defendant's expert LaPorte supported a page 1 substitution theory: "Page 1 and page 2 of the Work for Hire document were not produced contemporaneously, at the same time[.]"  He stated that the paper used for pages 1 and 2 is different and "originates from different sources," the toner on page 1 is different than the toner on page 2, and the ink used on page 1 is different than the inks on page 2. (JA-757).  Defendants' other expert, Frank Romano, also concluded that: "Page 1 of the 'WORK FOR HIRE' document appears to be a modification of Page 1 of the 'STREET FAX' document."  (JA-809).  They are wrong.

After defendants adopted the page 1 forgery theory, plaintiff's experts concluded that the theory was not only invalid, but it helped to authenticate the Work for Hire Contract because: (1) ***both pages of the Work for Hire Contract came from the same paper mill run***; (2) ***the formatting, fonts and ink on the two pages did not support a finding that page 1 was forged***; (3) ***there was one set of matching staple holes in the two pages, which established that the two pages***

*were in fact part of the same original document*; and (4) *the handwritten interlineation on page 1, with plaintiff's and Zuckerberg's initials, was impressed onto the second page*, another strong sign of authenticity. These conclusions, following the detailed expert analysis by James Blanco, are at JA-1669-1672 and in the report of Walter Rantanen (JA-1356). (See also JA-2330-2334). Plaintiff's expert, Larry Stewart, tested the toner on pages 1 and 2 of the Work for Hire Contract and found they matched. (JA-1118, ¶ 90; JA-1119, ¶¶ 92, 93).

Only after plaintiff's experts demolished the page-one-forgery-defense did defendants reverse direction and claim that *both* pages of the Work for Hire Contract were fake and the Street Fax document is the real contract.

Defendants' new claim that the Street Fax document is the "authentic" agreement was contradicted by overwhelming evidence in favor of the Work for Hire Contract's authenticity.

### iii. Defendants' Argument that Chemical Analysis of the Handwritten Ink on the Work for Hire Contract Revealed that the Ink Was *Less Than Two Years Old* is Not Supported By the Evidence, Much Less By Clear And Convincing Evidence

The conclusion of so-called "expert," Gerald LaPorte, that the ink on the Work for Hire Contract was less than two years old, was shredded by plaintiff's

expert Larry Stewart, who rebutted LaPorte's unreliable methodology and conclusions. Stewart Declaration (JA-1161-110 ¶¶ 342-440).

Stewart demonstrated that LaPorte's test has never been generally accepted or considered scientifically reliable, as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 US 137 (1999). (*Id.*, ¶¶ 343-405).[7] He explained the unreliability of LaPorte's methods (JA-1172-1180 ¶¶ 409-439) and summarized how Laporte's opinion fails to satisfy several *Daubert* criteria. (JA-1177 ¶ 428).

"Any finding based on Laporte's PE testing should be excluded as the science nor methodology are proven." (JA-1180 ¶ 440).

The magistrate was neither qualified nor authorized to resolve this conflict of the experts, and it was error for him to do so.

### iv. Defendants' Claim That "One of the Nation's Leading Document Authentication Experts Examined the Typesetting and Formatting of The Work for Hire Document" and Concluded it was an "Amateurish Forgery" is Misleading and Unsupported

The above captioned, discussed in Defs. Br.3-4, refers to Frank Romano, who, plaintiff's expert James Blanco pointed out, "lacks the industry standard

---

[7] "383. Laporte uses a method he developed that has not been independently evaluated and properly peer reviewed. His approach is not used in any state or federal forensic laboratory."

qualifications to opine as a Forensic Document Examiner. (JA-1605 n.23).
Stewart also observed, "To reach any conclusion regarding 'forgery' is both
reckless and unsupported by Romano's background and training." (JA-1142 ¶
248).

Both Blanco and Stewart refuted Romano's findings and conclusions. (JA-
1605-1606, 1608 ¶¶ 45-46, 50); (JA-1140-1142 ¶¶ 238- 252). Romano's
credibility was also undercut by his backing of defendants' discredited page 1
forgery defense.

The magistrate was without authority to appoint himself trier of fact in this
battle of experts.

### C. Defendants Ignore Zuckerberg's Access to His Harvard E-mail Account in *October 2010* and the Total Absence of E-mails Between Him and Plaintiff From April 2003 (When the Work for Hire Contract Was Signed), and June 2003.

Defendants argue that because Ceglia's e-mails with Zuckerberg are not on
Harvard's server, the e-mails are not authentic. (Defs. Br.37). This was rebutted
by the absence from the Harvard server of Zuckerberg's February 28, 2004 e-mail
threatening to hack into and disable the Street Fax web site, discussed above.
There is no explanation for its absence from the server other than Zuckerberg
accessing the server, as he had done previously, and deleting the e-mail and other

18

e-mails that support plaintiff's claim or rebut Zuckerberg's defense. The absence of the February 28 e-mail from the Harvard server refutes defendants' contention that because certain e-mails between plaintiff and Zuckerberg are not on Harvard's server, they must be forgeries and that alone creates an genuine issue of material fact. (See also, Docs. 199 and 397).[8]/

What speaks loudly is defendants' silence about their expert Bryan Rose's failure to account for Zuckerberg remotely accessing his Harvard e-mail account in October 2010, after the complaint in this case was filed, and the absence of all e-mails from April 28, 2003 (when the Work for Hire Contract was signed) to June 2, 2003. (See JA-307 Hearing Trans. (6/30/11) T.75:1-23). The evidence that he deleted e-mails from that account should have led to the inference that Zuckerberg destroyed evidence. (JA-623 ¶¶ 10-23).

### D. The Magistrate's Conclusion That Plaintiff Committed Acts of Sanctionable Spoliation of Evidence is Baseless

Defendants argue the magistrate found plaintiff committed "three discrete acts of spoliation" which warranted dismissing the complaint. (Defs. Br.74). There was no basis for those findings, except if one accepted only defendants'

---

[8] New evidence of the deletion of e-mails by Zuckerberg and the existence of other versions of his and Ceglia's contract on Zuckerberg's computer have recently surfaced in Ceglia's criminal case. Plaintiff intends to move to bring that evidence before this Court.

19

most favorable evidence.

### i.  The Conclusion That Plaintiff Failed to Produce Copies of All Versions of the Work for Hire Contract is Baseless Because Other Versions Do Not Exist

Defendants argue Ceglia failed to produce copies of all versions of the Work for Hire Contract.  Defs. Br.75.  This argument is another canard.  It assumes other versions exist based upon the discredited report by renegade "expert" Gus Lesnevich who cobbled together the "at least two versions of the contract" theory.

Plaintiff did not produce other "versions of the Work for Hire Document" because ***there is only one version*** – the one Ceglia produced.  Blanco destroyed Lesnevich's theory point by point (JA-1609-1619 ¶¶ 51-85), including because Lesnevich's approach is "not supported in the general scientific community" (JA-1610 n.27) or by defendants' other experts.  "I have performed detailed analysis of these different documents and have determined that they are just four different copies of the same document page, only scanned/copied and reprinted by various different machine processes."  (JA-1609 ¶ 51).  It is essential to review Blanco's report (JA-1609-1619 ¶¶ 51-85) and especially Exhibits 11-14 attached as evidence (JA-1735-1745), in order to understand Lesnevich's sleight of hand.

20

### ii.  Ceglia Did Not Produce E-mails That Were Backdated or Which Had Time-stamp Anomalies or Other Indicators of Fraud

Defendants ignore that preserving e-mails on floppy disks, as plaintiff did, was common method in 2003-04.  Jerry Grant, a Certified Access Data Forensic Examiner, examined the disks containing the e-mails and found that all e-mails were saved on disks using products "commercially available during the 2003/2004 time period," a finding that refuted defendants' contention that plaintiff created the e-mails around 2010 or 2011 when he filed his initial and Amended Complaints. (Doc. 418  pp. 10-11, ¶ 14).

Grant rebutted allegations of backdating and other "anomalies" which defendants' experts say indicated fraud.  No scientifically reliable opinion of fraud is possible without access to the hardware and software programs used in creating the disks, which are no longer available.  *Id.*  pp. 10-16, ¶¶ 15-24.

Grant found the "total editing time is 2 minutes on each document that contains the relevant e-mail messages.  This minimum editing time is more consistent with a copy/paste function than individual typing/editing of a document due to the amount of text."  *Id.*  p. 14, ¶ 23.  According to Grant, "Even the smallest file would require a high level typing skill if the contents were typed manually.  The others would be humanly impossible."  *Id.*

This is another instance where the magistrate acted as fact-finder to resolve conflicts in expert testimony bristling with genuine issues of material fact.

### iii.  Irrefutable Video and Documentary Evidence Show That Defendants' Experts, Not Ceglia, "Baked" The Work for Hire Contract

The baseless "baking" accusation arose from the yellowing of the Work for Hire Contract that occurred *when the document was being examined by defendants' experts* who over-exposed it to ultraviolet light.  Both Blanco and Stewart so found based on their involvement and a thorough review of the evidence.  (JA-1647-1668 ¶¶ 166-230); (JA-1133-1136 ¶¶ 182-201).

Blanco was present during the examination of the Work for Hire Contract by defendants' experts and saw their over-exposure of the document.  He was ignored when he expressed his concerns to those present.  (JA-1647-1648 ¶¶ 169-178).  He concluded:

> The imagery of the scans that I took show the discoloration now evident in the Facebook Contract, and my imagery also shows the writing pen ink damage, the likely causation attributed to extended exposure of the documents to UV and other light sources during the testing by Defense experts as well as, and in conjunction with the other examinations, testing and imaging of the Facebook Contract by the Defense experts.

(JA-1649 ¶¶ 176, 181).[9]/

---

[9] See Blanco's detailed description of defendants' experts' mishandling of the Work for Hire Contract.  (JA-1647-1648  ¶¶ 169-173).

22

Video evidence **proves** that the Work for Hire Contract was "baked" by **defendants'** experts. This evidence is in the Joint Appendix as three DVD enclosures, Exhibits 1 (Doc. 189), 2 (Doc. 204) and 3 (Doc. 191). It was ignored by the magistrate and now by defendants, thereby attesting to its irrefutability.[10]/

Larry Stewart compared the Work for Hire Contract on July 14, 2011, when defendants' expert Tytell first scanned it, to its condition one day later, when Lesnevich performed his first scan. The color images are attached as Appendix 1.[11]/

### iv.  Ceglia Did Not Destroy Six USB Devices And Any Relevant Evidence That May Have Been On The Devices Was Produced to Defendants

The magistrate erroneously found that plaintiff willfully destroyed six USB devices. Defendants failed to present proof that the six USB drives were either owned by, accessed by, or within the custody or control of plaintiff. *Chin v. Port Auth. of New York & New Jersey, supra*, 685 F.3d 135, 162 (2d Cir. 2012).

Defendants assert that files named "Zuckerberg Contract page1.tiff" and "Zuckerberg Contract page2.tiff" were once located on a now missing USB drive.

---

[10] See also, Declaration of Paul Argentieri at JA-382-386.

[11] The images at JA-1114 are not in color as they are here and in Stewart's Declaration in the district court.

(Defs. Br.77).  The spoliation claim was exposed as baseless during the deposition of defendants' expert Bryan Rose.

Rose identified two files that were allegedly stored on a USB device but not produced by plaintiff.  (JA-2303 T.200:5-11).  Files with the same name and size as files produced during discovery were said to have been on the missing USB device.  Rose acknowledged that the two files produced in discovery were likely the same as those on the missing USB drive.  (JA-2307-2309 T.205:10-207:18).

In light of defendants' expert's testimony, there could not have been a finding by clear and convincing evidence of prejudice or destruction of relevant evidence to justify the sanction of dismissal under *Chin v. Port Auth. of New York & New Jersey, supra.*

### v.  Reinstallation of the Windows Program Was Not Spoliation

The magistrate erroneously found that reinstallation of a Windows operating program on plaintiff's parents' computer was an act of spoliation by plaintiff.

Although the evidence failed to disclose that ***plaintiff*** destroyed evidence, there was also no indication that any evidence relevant to defendants' defenses was destroyed.  Certified Fraud Examiner Broom reported that the Windows Operating System was reinstalled by plaintiff's father, Carmine Ceglia, on his computer (JA-1472) "because the computer was not working properly."  However,

"this hard drive was forensically imaged on March 29, 2011" so that any

"[a]ctivity occurring on the hard drive after that date is not relevant to activities ...

in 2003-2004[.] (JA-1500). Further, "All parties agree that the [parents'] Seagate

hard drive has major issues with date entries; we contend that these issues could

have been caused by a problem with the CMOS battery because the computer was

unplugged for a long period of time or because of the viruses, Trojans, and

Rootkits that were found on the drive." *Id.* (see also JA-1474-1481).

Broom concluded that "none of the dates on this hard drive should be

trusted without external verification[.]" (JA-1500). It cannot be concluded that

*plaintiff* "backdated the hard drive to conceal the reinstallation." (Defs. Br.78).

### E.  The "Kasowitz Letter" is Sound and Fury Signifying Nothing

Defendants make much of the letter to plaintiff's attorneys by the Kasowitz

Benson law firm on April 13, 2011 (JA-2316-2317). The surrounding facts show

the letter is irrelevant.

First, it is hearsay. It was written by the Kasowitz lawyer after he received a

preliminary report from his experts who found the two illegible Street Fax TIFF

images on plaintiff's parents' hard drive. He stated the experts had "not produced

any written reports or opinions with respect to this matter." *Id.* They performed

no analysis relating to the authenticity of the Street Fax images.

25

The letter states they would "refrain from reporting to the District Court" until plaintiff's counsel, Lippes Mathias Wexler Friedman LLP, had a chance to look into the matter.

After plaintiff's counsel reported the results of the investigation to the Kasowitz firm, *neither* firm reported any impropriety to the district court. The fact is the Kasowitz firm erroneously concluded that the Work for Hire Contract was not authentic.

Defendants' further assertion that plaintiff has been represented by several other law firms because the lawyers concluded the Work for Hire Contract was not authentic, or that plaintiff had fabricated e-mails, is false and factually unsupported.

**F.  The Facts Show That Plaintiff Never Claimed the "Kole E-mails" Were Privileged.**

Another baseless charge is that *plaintiff* claimed the e-mails recovered from his parents' computer and Sidley Austin's server were privileged, thereby authenticating them.

The Declaration by Attorney Nathan Shaman (JA-1080) addresses this point. Shaman stated the claim of privilege was made by him as plaintiff's new counsel, out of an abundance of caution, after the e-mails were produced and

before discussing them with plaintiff.  After the emails were brought to plaintiff's attention, he disavowed their authenticity.  *Id.*

### G.  It Was Not Impossible, But Likely, That Plaintiff Visited TheFacebook Site Before it Went "Live"

The magistrate erroneously placed the burden of proof on plaintiff by concluding that he had not offered an explanation for defendants' contention that plaintiff could not have viewed TheFacebook website on the morning of February 4, 2004, when the site did not go "live" until that afternoon.  (SA-115).  The magistrate referred to Zuckerberg's declaration (Doc. 29-2 ¶ 25) in support of defendants' argument.  Yet, Zuckerberg *never* stated that TheFacebook site went "live" on the afternoon of February 4, 2004.  His declaration states only that "On February 4, 2004, I launched Facebook..."  (Doc. 29-2 ¶ 25).

The evidence one would expect is a declaration by Zuckerberg, under oath, that TheFacebook website was not launched until the ***afternoon*** of February 4, 2004, ***and*** that ***it could not be viewed by plaintiff on the morning of February 4, 2004***.  The hearsay evidence from third parties that the site went "live" that afternoon is not admissible.  *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221 (1939) (inferences should be drawn against parties who do not call as witnesses officials with knowledge).  It is commonly known that websites are first

27

launched as "beta" sites with limited access to be certain they will function properly when they go "live."[12]/  There is, therefore, a distinction between Facebook's "launch" and the site going "live."  (JA-2397-2398).  The fact that Ceglia could view the site when invited by Zuckerberg to do so on the morning of February 4, 2004, before it went "live," would be expected and is not indicative of fraud.  It is inconceivable that the site would have been viewable on-line for the first time *only* at the precise moment it went "live" to the public.

This pattern by defendants, which the magistrate accepted, of presenting hearsay evidence when a simple declaration from Zuckerberg was required should have led the court to the conclusion that Zuckerberg's evidence would have been unfavorable to defendants.  See, *Interstate Circuit, Inc. v. United States*, 306 U.S. at 221.

### H.  Defendants' and the Magistrate's Comments About McMenamin's So-called "Linguistic Analysis" Are Not Based on Clear and Convincing Evidence and Exemplify the Errors Committed Below.

Plaintiff objected to the magistrate's finding that "stylistic differences

---

[12] BusinessDictionary.com defines "beta test" as "a pilot test of a product (usually a software) before commercial quantity production."  "It is released to selected customers for testing under normal, everyday conditions of use to spot the remaining flaws."  On May 26, 2008, at www.beta.facebook.com, Facebook published that "we staged www.beta.facebook.com with the code we planned on pushing to the full web tier the following day."  These facts may be judicially noticed under Fed.R.Evid. 201(b) and 1101(a).

[between known and questioned emails] point to a highly probable conclusion that the Questioned writings were not authored by Zuckerberg." (SA-122). This was based on defendants' linguist, Gerald McMenamin whose report was discredited by Ronald Butters, then president of the International Association of Forensic Linguists. (NEW YORK TIMES, July 24, 2011, "Decoding Your E-Mail Personality").

Butters doubted that McMenamin could reliably conclude that Zuckerberg did not write the e-mails. He stated, "I simply questioned the validity of McMenamin's report, ... but only to suggest that it might be possible for forensic linguists to set some sort of ***standards for reliability and methodology, standards that, I would argue, McMenamin's report does not meet.***" (Doc. 502, p.50 n.10, citing http://languagelog.ldc.upenn.edu/nll/?p=3309 (emphasis added)).

The magistrate stated, "***<u>Defendants</u> have not replied in further support of McMenamin's findings***." (SA-121). ***When plaintiff did not respond to some of defendants' evidence, it was taken as acquiescence or an admission by plaintiff; but, when defendants failed to respond, the magistrate simply proceeded to make their arguments for them.*** This exemplifies the error which infects the entire R&R: viewing defendants' most favorable evidence and ***speculating for defendants' benefit about what might have occurred: "one plausible***

29

*explanation"; "could have been created"; "would then have presented"; "would*

*have appreciated"; "could have printed"; "would have perceived."* (SA-81

n.52).

### I.  Last Accessed Dates, Incorrect Time Zone Stamps and Inconsistent Formatting Do Not Indicate Ceglia's E-mails are Fraudulent.

The magistrate erred in relying on defendants' expert Stroz Freiberg's

opinion that anomalies in dates and inconsistencies in formatting indicated fraud.

Plaintiff's computer forensic expert, Jerry Grant, explained that, "Microsoft

generally discredits the reliability of the 'last accessed' timestamp, since it is

easily altered by system operations that are not directly user-initiated."  (JA-1515-

1516 ¶ 8).  Stroz published the same opinion, that "metadata are generally only as

accurate as the underlying computer clock time" (*Id.*), which, incredibly, was

unknown to Stroz's Bryan Rose. (JA-2314) T.251:7-13.

Defendants claim that "erroneous backdating is another indicator of fraud,

but they, like the magistrate, discounted Grant's evidence and Rose's ignorance.

It is true Grant did not opine in his June 4, 2012, declaration that the e-mails

are authentic.  Defs. Br.70.  That was not his job.  Rather, Grant's opinion is that

there are no indications of fraud in Ceglia's e-mail media.  He deals with this in

detail at JA-1516-1529 ¶¶ 11-24, and specifically comments on the flaws in Stroz's report (¶¶ 16-23).

Similarly, Neil Broom, debunked the "erroneous backdating," "incorrect time zone stamps," and "inconsistent formatting and abbreviations." With respect to Stroz's allegation of backdating, Broom concluded, "[i]f a computer has been unplugged for a long period of time it is possible for the battery to drain and the CMOS clock to give erroneous readings." (JA-1492). Broom also explains how the viruses, Trojans, and Rootkit files on the computer could have caused anomalous dates. *Id.*

Broom discredits Stroz's "time zone stamp" anomalies and points out the glaring inconsistencies in the Stroz report, which should have given rise to serious credibility issues for Stroz's experts. (JA-1493-1494).

Finally, the supposed "inconsistent formatting and abbreviations" were explained by plaintiff, but ignored by the magistrate. Contrary to defendants' statement, plaintiff rebutted the formatting inconsistencies. For example, Broom addressed formatting differences at JA-1498. His explanation is simple: "the author of the document could have altered the spacing" (*Id.*), a likelihood not accepted by the magistrate or discussed by defendants. Grant also addresses the

31

"inconsistent formatting and abbreviations" and explains why they do not indicate fraud. (See *e.g.*, JA-1522 ¶ 13 and JA-1526 ¶ 21.)

The R&R is bereft of evidence sufficient to support the drastic remedy of dismissal. "[A] court should never impose spoliation sanctions of any sort unless there has been a showing – inferential or otherwise – that the movant has suffered prejudice." *In re Pfizer*, 2013 U.S. Dist. LEXIS 2850, *49 (S.D.N.Y. January 8, 2013) (citation and internal quotation omitted). The absence of prejudice can be shown by demonstrating that the other party was able to obtain the same evidence from another source. *Id.* at *50 (quoting *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24-25 (S.D.N.Y. 2010).

Here, the facts showed no prejudice and the standards in *Chin v. Port Auth. of New York & New Jersey, supra,* 685 F.3d at 162, are absent.

## II.  CONCLUSION

For the foregoing reasons and those in appellant's opening brief, plaintiff respectfully requests that this Court conduct a *de novo* review of the decision below and reverse the judgment of the district court.

Dated:  December 10, 2014           Respectfully submitted,
           Holmdel, NJ

                                              By:    s/  Gil D. Messina
                                                     Gil D. Messina
                                                     Joseph M. Alioto
                                                     Attorneys for Appellant Paul D. Ceglia

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Word Perfect X7 in Times New Roman, 14 point font size.

Dated:   December 10, 2014          <u>s/ Gil D. Messina</u>
                                    Gil D. Messina

# APPENDIX 1

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

1. Definitions

The following terms have the meaning specified when used herein:
PURCHASER - Paul Ceglia
CONTRACTOR/SELLER – Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services.
CUSTOMER – StreetFax LLC the entity contracting for

5. Purchaser's Property/Seller's Responsibility
For the StreetFax database Buyer agree to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other

Tytell Exhibit B - reportedly his first scan on 7/14/11

Case 1:10-cv-00569-RJA -LGF   Document 239-1    Filed 11/28/11   Page 2 of 3

# "WORK FOR HIRE" CONTRACT

## SECTION 1- GENERAL PROVISIONS

1. Definitions

The following terms have the meaning specified when used herein:
PURCHASER - Paul Ceglia
CONTRACTOR/SELLER – Mark Zuckerberg, his agents, employees, suppliers, or sub-contractors, furnishing materials equipment, or services.
CUSTOMER  StreetFax LLC the entity contracting for
construction or other services form the Purchaser or which the goods and/or

5. Purchaser's Property/Seller's Responsibility
For the StreetFax database Buyer agrees to pay for and maintain the cost of upkeep for the servers needed for it's operation.

For "The Face Book" Seller agrees to maintain and act as the sites webmaster and to pay for all domain and hosting expenses from the funds received under this contract, and Seller agrees that he will maintain control of these services at all times.

Data, drawings, tooling, patterns, materials, specifications, and any other

Lesnevich Exhibit A - reportedly his first scan on 7/15/11